JOSEPH LICHTENFELS, JOHANNA L. ABRAHAMS, CAROLYN L. GREEN, AND HELEN L. GUMPERT v. NORTH CAROLINA NATIONAL BANK, A CORPORATION.

(Filed 23 November, 1966.)

**1. Trusts § 7—**

A trustee, in the management, investment and reinvestment of the trust property, will not be held liable to the beneficiaries for the difference between the value of the *corpus* of the trust at the time of distribution and the value it would have had, in the light of hindsight, if the trustee had sold certain stock of the estate and reinvested, but the trustee may be held liable only for losses resulting from its failure to act in good faith or its failure to use ordinary care and reasonable diligence in the management of the estate.

**2. Same—**

Where the trustor fixes rules for the exercise of discretionary power in the trustee to invest and reinvest the trust property, the trustee must follow the trustor's directive unless such directive becomes impossible of performance, or is illegal, or there is such a change of circumstances as to justify or require a deviation therefrom.

**3. Same;    Executors and Administrators § 9—**

The trustee of a testamentary trust, as well as an executor, is a person named by the testator to carry into effect the intention of the testator as ascertained from the instrument and to dispose of the estate according to its terms, and the trustee must give effect to such intent unless it is contrary to some rule of law or at variance with public policy.

**4. Same—    Evidence held insufficient to show mismanagement of trustee in failing to diversify trust holdings.**

The *corpus* of the trust created by the will in question included a block of stock in a closely held family corporation, which, through various mergers and stock splits, comprised a large percentage of the trust estate. The will in question expressly authorized the trustee to retain the stock as a proper investment and left it solely to the discretion of the trustee to allow the investment to remain intact, but with power to invest and reinvest. The evidence further tended to show that those in the management of the family corporation were careful, cautious and highly respected businessmen, that the corporation operated close at hand and the management was well known to the trust officers, that the trust officers periodically reviewed the portfolio, did sell a small amount of the stock for reinvestment, and that their retention of most of the stock was in accordance with the wishes of the life beneficiary of the trust. *Held:* The evidence fails to establish a right in the distributees of the *corpus* to surcharge the trustee with a breach of trust in holding a large part of the *corpus* in the stock of the corporation and in failing to sell more of the stock for reinvestment.

APPEAL by plaintiffs from judgment dismissing the action entered by *Campbell, J.,* on January 13, 1966, in the Superior Court of BUNCOMBE County.

The plaintiffs instituted this civil action on February 1, 1963, alleging they, as remaindermen, are entitled to surcharge the defendant, Trustee of the Carrie C. Long Trust, with the sum of $2,467,854.55 resulting from the trustee's mismanagement. The alleged mismanagement consisted in retaining 18,000 shares of Cone Mills stock which should have been sold for diversification.

The Will of Carrie C. Long, executed April 25, 1923, was attached to and made a part of the complaint. After disposing of the household effects and certain other bequests, the testatrix devised and bequeathed all other property to the executors in trust "to divide into two equal parts." One part with its income was given to her daughter, Edna L. Lichtenfels, for life, with the remainder to her children. The oldest child at the time was 11 years of age. The other one-half of the trust with interest was given to another daughter, Dorothy L. Berney, for life, with remainder to her children. The trusts were administered as one until May 14, 1938, when they were separated. The Berney trust is not involved in this action.

Among the assets of the Lichtenfels trust were 258 ½ shares of common and 126 ½ shares of preferred stock in three Cone corp-

orations. In 1946, by consolidation and mergers, both the common and preferred stocks were retired and 9,101 shares of common stock in Proximity Manufacturing Company were substituted. On January 1, 1948, the Proximity Manufacturing Company stocks were retired and in lieu thereof 27,303 shares of common stock in Cone Mills Corporation were issued.

The Carrie C. Long will contained this directive:

"THIRD: I hereby grant to my said Executors and Trustees, or the survivor of them, full power and authority to sell, mortgage, exchange or otherwise dispose of any property, whether real or personal, which may come into their possession, or to which they may be entitled as a part of my estate, and vest them or the survivor of them with full power and authority to convert all or any part of my estate into cash, upon such terms and at such times as they may deem it proper to do for all the purposes herein mentioned, and with like power and authority to invest and reinvest any and all funds held by them as Trustees, in such securities as they may deem wise and expedient. My trustees are hereby expressly authorized to retain as a proper investment of trust funds, any stock or other securities owned by me, or which may be purchased by them after my death, and I leave it solely to them to allow such investments to remain intact to be increased, reduced, or entirely converted into our other investments or securities."

During the course of the trial, lasting six weeks, the parties examined expert and other witnesses and introduced numerous documents. The plaintiffs' witnesses testified in substance that a prudent investor would have applied the doctrine of diversification to guard against loss and to produce certain gain on an advancing market and should have sold the major portion of the Cone Mills stock. One of the experts, Dr. Latane, testified:

"Based upon these records and the evidence that I have considered, and the records in this case, I have an opinion satisfactory to myself as to whether or not the action of the Trust Review Committee on that date (1947) in connection with this Trust was the conduct of a prudent investor. My opinion is that it was not conduct suitable for a prudent investor because the Trust was clearly overbalanced and held far too much Proximity Manufacturing Company capital stock."
* * *

"I have an opinion satisfactory to myself as to what action a prudent investor and Trustee would have taken on that date.

I believe a prudent investor on that date would have already been actively planning and carrying out a policy of reduc- .ing the holdings of Cone Mills Stock from 27,303 shares to approximately — to 1,303 shares of stock."

Another witness, Mr. McCarley, after designating Cone Mills stock as cyclical, testified:

"I have an opinion satisfactory to myself as to the percentage of a trust or investment portfolio that a prudent investor would devote to or have invested in cyclical stocks. I would like to state that there are many opinions in this, my personal opinion is that in the neighborhood of not over 20 per cent of the total investment should be in cyclical securities." * * *
"I have an opinion satisfactory to myself as to what percentage of a total portfolio a prudent investor would have devoted to or invested in any one individual cyclical stock. My opinion is not over five per cent in any one issue."

Other witnesses gave similar opinion evidence.
The defendant also offered many witnesses, including investment experts. Mr. Holderness testified:

"I have an opinion satisfactory to myself as to whether or not the stock of the two companies (Proximity and Cone Mills) was suitable for retention by a prudent investor or prudent Trustee from 1947 until date. I think it definitely was suitable, and that its retention would be prudent. * * * If I held stock which was suitable for retention, I would not sell it solely for purposes of diversification."

Mr. Miller, investment analyst and partner in Drexel and Company, Philadelphia, testified:

"There are approximately 500 textile manufacturers in this country. I would describe approximately 20 of them as being major producers . . . Cone Mills being fifth or sixth in sales in the United States. We have made a study or investigation of the financial structure and condition, including the results of operations, assets, liabilities and net worth, of Cone Mills Corporation, formerly named Proximity Manufacturing, during the period from the beginning of 1946 through the year 1962. In making such a study or investigation, the sources of information used were the ones I have already mentioned that are applicable to financial study. They would be the annual reports in Moody's and Standard & Poor's, the financial statements prepared by A. M. Pullen & Company, the Reorganization

Plan of the Cone Companies, and, of course, all of the other industry data which I have mentioned.

"Based upon my investigation, I have an opinion satisfactory to myself as to whether the common stock of Cone Mills Corporation, formerly Proximity Manufacturing Company, from the standpoint of quality was suitable for retention by a prudent investor at all times during the period from January 1, 1946, through December 31, 1962. The opinion is that the common stock of Cone Mills was suitable for retention from the standpoint of quality by a prudent investor during this period."

Other witnesses gave similar testimony.

Mr. McPheeters testified: "I was a director of the bank most of the time and a member of the Trust Committee. . . . In those meetings, the Carrie Cone Long Trust was considered very carefully, repeatedly. . . . I believe the minutes reflect that consideration was given to the Carrie Cone Long Trust in those meetings an average of two to four times a year. The members of the Trust Department considered the Carrie Cone Long Trust very frequently. * * *

"In the light of the income that was being derived from this stock, comparable to anything that we could possibly hope to reinvest in, plus the likelihood, in our opinion, at least, of general appreciation in value of the assets, determination was made to retain the stock, of course taking into account always the provisions of the will, and advice of the estate's attorney and the wishes of the life tenant."

The evidence disclosed, and the court found, that Cone Mills stock was closely held by the Cone family. It did not have an established market value until it was listed on the New York Stock Exchange in November, 1951.

"12. The various Cone family holdings heretofore referred to were closely held family stocks and were not traded on any listed or over-the-counter market until the year 1947, and the defendant and its predecessor, Security, in the absence of readily available 'market' values, used the par value of said holdings in its trust review sheets; (that the so-called Cone family holdings were treated separately by the trustee until the year 1947) when a 'market' value was more readily ascertainable; that at all times from May 4, 1936, when the defendant and its predecessor, Security, began to administer the trust estate, the so-called Cone family securities amounted to more than 35%

of the entire holdings of corporate stocks, and in May, 1948, amounted to as much as 90% of all the corporate stock holdings." (This resulted from reorganization. No Cone Mills stock was purchased.)

"13. That the so-called Cone family stock holdings, pursuant to various mergers and stock splits and name changes, in 1946 became 9,101 shares of Proximity common stock and in 1948 became 27,303 shares of Cone Mills Corporation common stock; that on November 4, 1951, Cone Mills Corporation stock was admitted to trade on the New York Stock Exchange."

On July 20, 1949, the defendant's Trust Department wrote the life tenant:

"A recent review of the securities in your Trust indicates that 91.6 per cent of the investments are in common stocks, the value of the Cone Mills Corporation stock accounting for practically all of this percentage. The practice of confining the investments of any Trust to one security has never been considered a wise procedure and the Trust Committee of our Board of Directors has discussed several times the question of disposing of at least a part of the Cone Mills stock in order to diversify the investments held in this Trust. They, of course, have been cognizant of the family connection, the standing of the Company in the industry as well as its financial statement and liberal dividend policy. We have assumed in the past that due to the reasons mentioned above, and possibly others, and the fact that we have heard nothing from you in this connection, that there was no desire on your part that any part of the holdings of Cone Mills stock be disposed of for reinvestment. If our assumption is correct and it is your desire that we continue to retain all of the stock, please so indicate upon the bottom of the copy of this letter which is attached."

The life tenant replied: (July 23, 1949)

"You are correct in assuming that there is no desire on my part that any part of the holdings of Cone Mills stock be disposed of for reinvestment. I am perfectly satisfied with the investment, and pleased with the income it produces, and I would feel distressed if you disposed of any of the stock for the purpose of reinvestment. Very truly yours, Edna Long Lichtenfels."

On September 26, 1952, the Trustee wrote life tenant:

"The committee is mindful of your connection with the Company as a member of the family and is also well aware of the bril-

liant success that the corporation has made. However, it is felt that for your benefit and for the benefit of those who will receive the estate in the future the prudent approach is to reduce the holdings of the Cone stock by sale and to reinvest in tax exempt bonds. To do this will probably increase rather than decrease your spendable income, since if you are in the 75% income tax bracket a 2% tax exempt return at that range is the equivalent of an 8% taxable return.

"We plan, therefore, to sell at the market 2,303 shares of the 27,303 that are held in the account. It is our further plan to keep the matter before us with the idea of making further reductions in the stock holding from time to time.

"We hope that you will agree that this is the best thing to do."

The life tenant replied:

"I concur with you that it is wise to reduce the holdings of Cone stock and diversify the risk, especially since I have heard so much talk about a depression next year and am rather concerned about 'having all my eggs in one basket.' I appreciate the action you have already taken, with reference to the 2,303 shares you have sold and reinvested in first class municipal bonds."

On September 16, 1958, the Trust Officer wrote:

"We completed the sale of 2,303 shares Cone Mills Corporation stock in 1953 and also sold 2,000 shares in 1954. These shares were sold in the $24 and $26 price range. Since the account is still very heavily invested in one common stock and since there is no indication of an early up-turn in earnings for the textile industry generally, and further due to the fact that Cone Mills Corporation stock has moved up substantially in price from recent lows, our Trust Investment Committee now recommends the following:

"Sell:    3,000   shares   Cone   Mills   Corporation—$43,540.00.

"Purchase:$30,000 Tax-free municipal bonds rated 'A' or better by Moody's, to yield about 3½%."

The Court further found that during the administration of the Trust the life tenant, Mrs. Lichtenfels, mother of the plaintiffs, received income from the trust in the amount of $946,684.07. Upon all the evidence, the Court found:

"11. That the defendant and its predecessor, Security, kept and maintained trust review sheets showing the assets of the trust from time to time together with the dates of the various

reviews as set forth and contained in Stipulation 24-A, which Stipulation is made a part of this finding."

"13a. Stock of Cone Mills Corporation and its predecessor companies, at all times during the administration of this trust by the defendant and its predecessor, Security, was suitable, from the standpoint of its quality, for retention within the corpus of the trust."

"19. That at the close of the plaintiff's evidence, and again at the close of all the evidence, the defendant moved for judgment of nonsuit, and the Court being of the opinion that there was sufficient evidence of the lack of due diligence on the part of the trustees under the prudent man rule in failing to diversify and in selling other stock in lieu of the Cone stock to raise an issue for the Court acting as a jury, said motions were overruled, but, in view of the subsequent conclusion as a matter of law that the prudent man rule is not applicable to this case under the terms of the will in question, the Court is not called upon and does not make further findings of fact bearing upon said issue."

From the findings of fact, the court concluded:

"1. The defendant and its predecessor, Security, performed duties as trustee of the trust in good faith and without any fraud, direct or indirect.

"2. The Will of Carrie Cone Long vested in the defendant and its predecessor, Security, as trustee, not only the express authorization to retain investments in stock or other securities but said instrument left it 'solely' to the trustee (the defendant and its predecessor, Security) to allow such investments to remain intact, to be increased, reduced, or entirely converted into other investments or securities.

"3. That, in view of the terms and provisions of said Will, the Court is not called upon and does not pass upon the duty of the defendant and its predecessor, Security, to diversify investments as between so-called equities and fixed income investments and as between the individual type of holdings in each group as being required as a part of the duty of a trustee at all times acting in conformity with the actions of a prudent investor.

"4. The trustee had the express power under the terms of the Will to determine whether or not to diversify the investments in the trust, and this power relieved it of any duty to diversify the investments of the trust in the absence of bad faith, fraud

or abuse of discretion, and there was no bad faith, fraud or abuse of discretion on the part of the trustee.

"5. The trustee did not breach any duties imposed upon it by the terms of the Last Will and Testament of Carrie Cone Long, as hereinabove interpreted by the Court, and this action is therefore dismissed, and the costs to be taxed by the Clerk are charged to the plaintiffs without any charge for defendant's attorneys' fees."

The plaintiffs entered numerous exceptions both to the findings of fact and to all conclusions of law. These exceptions constitute the basis of plaintiffs' assignments of error.

*Williams, Williams and Morris by Robert R. Williams, Jr., for plaintiff appellants.*

*Adams, Kleemeier, Hagan & Hannah by Charles T. Hagan, Jr., and Uzzell and DuMont by Harry DuMont for defendant appellee.*

HIGGINS, J. During the pleading stage of this controversy the court heard and passed on numerous motions to strike from, and by amendment add to, the pleadings. On defendant's motion the court ordered the case transferred to Mecklenburg County for trial. The order was reversed by this Court. The opinion, reported in 260 N.C. 146, contains factual background not now repeated.

After the removal order was vacated and the case returned to Buncombe County, the parties, by stipulation, waived a jury trial and consented for Judge Campbell to hear the evidence, find the facts, enter his conclusions of law, and render judgment. See *Woodward v. Mordecai,* 234 N.C. 463, 67 S.E. 2d 639. Based upon the findings, Judge Campbell concluded the plaintiff had failed to make out a case and entered judgment dismissing the action. The plaintiffs excepted and appealed.

The case on appeal, including the exhibits, comprises more than 1,800 pages. Each of the briefs exceeds 100 pages. Notwithstanding the length of the record, the parties, by stipulation, limited the inquiry to these questions: (1) Did the plaintiffs establish their right to surcharge the trustee with a breach of trust resulting in loss? And (2), if so, what was the amount of the loss?

The powers and duties of the trustee in this case have their foundation in the trust instrument — the Will of Mrs. Carrie C. Long. The will specifically provides: "My trustees are hereby expressly authorized to retain as a proper investment of trust funds, any stock or other securities owned by me, or which may be pur-

chased by them after my death, and I leave it solely to them to allow such investments to remain intact . . ."

The Lichtenfels Trust, among other assets, received 258½ shares of common and 126½ shares of preferred stock in three Cone corporations. In 1946, by consolidations and mergers, the common and preferred stocks were withdrawn and in lieu thereof 9,101 shares of common stock in Proximity Manufacturing Company were substituted. In 1948 the Proximity stock also was withdrawn and 27,303 shares of Cone Mills Company stock were substituted. At the time of settlement the trustee delivered to plaintiffs 18,000 shares of Cone stock. The other 9,303 shares had been sold in small blocks for purposes of reinvestment.

When the first sale was proposed, Mrs. Lichtenfels was consulted and replied: "I would feel distressed if you disposed of any of the stock for purposes of reinvestment." This advice was given by the life tenant who was the mother of the remaindermen. Later, she approved the trustee's sales made for purposes of some diversification. Is the trustee now responsible for failure to sell more? Here are some of the rules by which the trustee's conduct on this question should be judged:

> "Trustees are justly and uniformly considered favorably, and it is of great importance . . . that they should not be held to make good losses in the depreciation of stocks or the failure of the capital itself, which they hold in trust, provided they conduct themselves honestly, and discreetly and carefully, according to the existing circumstances, in the discharge of their trusts. If this were held otherwise, no prudent man would run the hazard of losses, which may happen without any neglect or breach of good faith." *Sheets v. Tobacco Co.*, 195 N.C. 149, 141 S.E. 355.
>
> "Good faith and the use of ordinary care and reasonable diligence are all that can be required of executors and administrators . . . They are not insurers." *Thigpen v. Trust Co.*, 203 N.C. 291, 165 S.E. 720.

The foregoing cases were decided on the general rule. In them sole discretion or other directives were not given by the trustor.

> "When it appears that a trustee has exercised, or proposes to exercise . . . discretion in good faith, and with an honest purpose to effectuate the trust, the courts will not undertake to supervise or control his actions. They will not undertake to set aside or override his judgment in matters clearly committed to his discretion, and to substitute therefor the judgment of others,

or their own judgment, upon the sole allegation that the action of the trustee is not wise or just." *Carter v. Young,* 193 N.C. 678, 137 S.E. 875.

"It is not the province of the courts to substitute their judgment or the wishes of the beneficiaries for the judgment and wishes of the testator. The controlling objective is to preserve the trust and effectuate the primary purpose of the testator." *Carter v. Kempton,* 233 N.C. 1, 62 S.E. 2d 713.

"A breach of trust necessarily supposes that there is a rule for the government of the trustee. The creator of the trust may prescribe what rules he pleases." *Hester v. Hester,* 16 N.C. 328.

"A trustor is privileged to impose terms and conditions upon the administration of his estate, as well as to select the agencies for the distribution of his bounty." *Young v. Hood,* 209 N.C. 801, 184 S.E. 823.

The law selects and applies certain standards for the conduct of trustees. The trustor, however, may fix the rules for the exercise of the powers given, "except so far as the performance of the duties or the exercise of the powers is or becomes impossible, or the provision is illegal, or there has been such a change of circumstances as to justify or require deviation from the terms of the trust." Scott on Trusts, 2d Ed., § 164.

The testator's intention must be ascertained from the will and given effect "unless it is contrary to some rule of law or at variance with public policy." *Entwistle v. Covington,* 250 N.C. 315, 108 S.E. 2d 603.

An executor (likewise a trustee) is one named by the testator and appointed to carry the will into effect after the death of the maker and to dispose of the estate according to its terms. *In Re Will of Wilson,* 260 N.C. 482, 133 S.E. 2d 189; *Trust Co. v. Bryant,* 258 N.C. 482, 128 S.E. 2d 758; *Callaham v. Newsom,* 251 N.C. 146, 110 S.E. 2d 802.

More is involved in this case than the wisdom of diversification in the management of a trust estate. The corpus of the trust contained what had become a large block of Cone Mills stock. The Cone family originated and developed the textile business into the fifth or sixth largest in this country. The ownership and management were in the hands of members of the family. According to the evidence, those in control were careful, cautious, highly respected and successful businessmen. The trustor, a member of the family, made her brothers executors and trustees. She provided, however, that the Atlantic Bank and Trust Company, defendant's predecessor, should succeed the brothers if they failed to qualify. The terms

of her will expressly authorized the trustee to retain The Cone stock as a proper investment of trust funds. ". . . and I leave it solely to them to allow such investment to remain intact."

By succession, the present defendant became trustee. Its trust officers lived in Greensboro. They were well acquainted with the business operations of Cone Mills. The trust officers and trust committee of the defendant knew that to sell stock in a company operated close at hand and whose management they knew to be careful and successful, and to reinvest in other stocks would not only involve transfer and brokerage fees, but would place in the trust portfolio stocks in companies operated away from Greensboro by people not known, or not well known.

But recognizing, as the trust officers of the defendant bank did, that under ordinary circumstances there is some safety in diversification, nevertheless these questions confronted the trustee: When would it be good business to sell Cone stock? When, and at what prices, would it be good business to buy replacements? Not only the considerations discussed in the preceding paragraphs, but the directives in the will served not to lock, but to put a brake on, and to slow down, the spin of the diversification reel. Mrs. Long had taken the risk of accumulating and retaining what had developed into a large block of Cone Mills stock. By the terms of her will she authorized her trustee to continue the risk solely in its discretion. The excellent income, amounting to almost one million dollars, to the life tenant was an added inducement to hold Cone stock.

The depreciation in the value of textile stocks, according to one witness, resulted from two-price cotton and synthetics. By looking backward, one may find in financial records times at which Cone stock could have been sold and times and prices at which other stock could have been bought with great benefit to the trust. But wisdom resulting solely from a backward look is not a fair test. Many businesses considered by the experts as sound, have wound up in bankruptcy. The future of a business, as an investment, may look bright, but success is never a certainty. The experts are able to give well informed forecasts but future success is only a hope and a prediction — never a certainty. Looking backward to 1946, two hundred fifty-eight and one-half shares of common stock and 126½ shares of preferred stock had, by consolidation, become 9,103 shares of Proximity Manufacturing Company stock; and in 1948 had become 27,303 shares of Cone Mills. The trustee held and delivered to the plaintiffs 18,000 shares. The remainder had been sold in small blocks for reinvestment. When a sale was first proposed, Mrs. Lichtenfels, the life tenant, advised ". . . I would feel distressed if you dis-

posed of any of the stock for purpose of reinvestment." This advice came from the life tenant who was the mother of the remaindermen. Later on, however, she approved the trustee's sales made for purposes of diversification.

The parties in their exhaustive briefs have discussed various rules relating to diversification. The discussions involved the Massachusetts, New York, and Pennsylvania rules, the prudent man, the all eggs in one basket, the bad faith and gross negligence rules, and cite cases, textbooks and law review articles sufficient to keep a slow reader busy from now until Christmas. 47 A.L.R. 2d, 187; 54 Am. Jur., § 327; Scott on Trusts, 2d Ed.; Bogert on Trusts, § 683; 41 Columbia Law Review 1282; Vol. 61 Michigan Law Review 1545. After all, this is a North Carolina case. The trust was created by the Will of a North Carolina citizen to be administered under the laws of this State. Here the directives in a Will are honored and given effect unless some over-riding and compelling reason requires deviation. *Redwine v. Clodfelter*, 226 N.C. 366, 38 S.E. 2d 203; *Cocke v. Duke University*, 260 N.C. 1, 131 S.E. 2d 909. The rule of law which fits this case is stated in 47 A.L.R. 2d 187, at 266: "But where a decedent leaves an estate which is not diversified in a prudent manner, as where the principal asset of the estate is stock in a family corporation, and he authorizes the retention of investments, the trustee is not obliged to sell part of the assets merely to obtain diversification." Citing authorities, including the leading diversification State — Massachusetts.

As a side reflection on the trustee's decision to sell only 9,303 shares of common stock at prices as low as $12.37 per share, we may note the stipulation in this case that on the day of distribution, November 8, 1963, the fair market value of Cone Mills stock was $14.77 per share; and on the day trial began, April 26, 1965, the stock had a fair market value of $26.87 per share. From the foregoing it may be well argued the trustee sold as much as was wise.

The evidence shows, and the court found, the defendant gave due attention to the composition of the Long trust. The record sustains Judge Campbell's findings and conclusions that the plaintiffs have failed to make out their case. The judgment dismissing the action is

Affirmed.